NONES, DEMANDANTE Y APELANTE, *v.* SUCESIÓN SERRALLÉS, DEMANDADA Y APELADA.

APELACIÓN procedente de la Corte de Distrito de Ponce en pleito sobre daños y perjuicios.

No. 2773.—Resuelto en febrero 7, 1924.

EVIDENCIA—PRUEBA DE LA AGENCIA—EVIDENCIA ADMISIBLE.—Para probar que la demandada negociaba con determinada persona como agente de una compañía se presentó una carta aparentemente expedida por dicha compañía introduciendo a dicha persona como tal agente. *Se resolvió:* que habiendo sido dicha carta recibida y aceptada como auténtica por la demandada, quien actuó de acuerdo con ella, era admisible sin ulterior prueba de autenticidad.

EVIDENCIA SECUNDARIA—COPIA DE ESCRITOS—ADMISIÓN DE EVIDENCIA SECUNDARIA—DISCRECIÓN JUDICIAL.—Cuando una corte ejercita su discreción en la admisión de copia de un escrito que no se probó haberse extraviado o destruído o estar fuera de la jurisdicción del tribunal, si la parte que se opone a su admisión no levanta debidamente estas cuestiones y hay indicios en los autos de hallarse dicho escrito en poder de la parte contraria o en poder de su causante y fuera de la jurisdicción de la corte, el Tribunal Supremo no intervendrá en el ejercicio de esa discreción.

ID.—DECLARACIONES PARA BENEFICIO PROPIO *(Self-serving Evidence).*—Una carta que forma parte de la correspondencia contentiva de los términos de un contrato, escrita por una de las partes contratantes, no puede considerarse como una declaración en beneficio propio *(self-serving declaration)* a los efectos de su admisión en un pleito posterior entre dichas partes, por el hecho de que tienda a sostener la teoría de la parte que la escribió.

ID.—COPIAS DE CARBÓN.—Del artículo 84 de la Ley de Evidencia no se desprende que fuera la intención del legislador excluir, en casos apropiados, las copias de carbón de cartas no copiadas en el copiador ni enviadas por correo sino entregadas por el autor al destinatario o a su agente.

Los hechos están expresados en la opinión.

Abogados del apelante: *Sres. J. A.* y *A. S. Poventud.*

Abogado de la apelada: *Sr. F. Parra Capó.*

EL JUEZ ASOCIADO SR. HUTCHISON, emitió la opinión del tribunal.

La demanda en este caso alegaba entre otras cosas lo siguiente:

"2. Que, de acuerdo con la información y creencia del actor, allá por el día 5 de abril de 1920, la demandada otorgó una opción a favor de don Louis Fally, mayor de edad, que duraría hasta las nueve A. M. del día 9 de abril de 1920, para la compra de cinco mil sacos de azúcar lavada, de 125 libras cada uno, netas, de dicha

Central Mercedita, propiedad de la demandada, al precio de $15 el quintal f. o. b. Ponce, para embarque y entrega en o antes de abril 30, 1920, debiéndose pagar tal precio contra entrega de los documentos de embarque por la demandada, a la que se debía garantizar el referido precio por un banco.

"3. Que el expresado Louis Fally, en abril 8, 1920, cedió sus derechos bajo la precedente opción u oferta, por medio del agente y comisionista de Ponce don Rafael Collazo, al demandante don Adolfo Nones, por precio de $15.50 el quintal de azúcar, y éste, en la tarde del referido día 8 de abril, 1920, antes de expirar la ameritada oferta, aceptó, e hizo comunicar, como se comunicó, dicha aceptación de tal opción, a la demandada por conducto de su indicado apoderado señor Giles e informándole que el Banco Comercial de Puerto Rico se había obligado a garantizar el indicado precio fijado por la demandada, la que entonces alegó, por medio del Sr. Giles que la opción referida había expirado, por lo que rehusaba cumplir dicho contrato, y siendo así que tal oferta de la demandada no vencía hasta el día siguiente abril 9, 1920, a las 9 A. M., según se deja consignado."

La contestación después de negar estas alegaciones expresaba afirmativamente:

"Que hacia marzo 26 de 1920 el señor Mauricio Fally como agente en Puerto Rico de The Maxim Chemical Co. de New York solicitó de la demandada precio por cinco mil sacos de azúcar la vada. Esta demandada le cotizó $13.50 por quintal f. o. b. embarcado en Ponce y le dió hasta marzo 31 para recibir la contestación al ofrecimiento que había de hacerse del azúcar en los Estados Unidos por la Maxim Chemical Co. o por el señor Mauricio Fally en representación de ella.—Fué condición especial que los compradores depositarían al mismo tiempo el importe de la mercancía en el Royal Bank of Canada, de Ponce. En estas condiciones la demandada se encargaría del embarque del azúcar.

"Esta venta de cinco mil sacos de azúcar fué confirmada por telegrama del señor Mauricio Fally en marzo 31 de 1920 afirmando además que había sido abierto en el Royal Bank of Canada en Ponce un crédito a favor de la demandada de acuerdo con lo convenido.

En abril 1 de 1920, o sea al día siguiente, el Royal Bank of Canada en Ponce negó tener tal crédito abierto a favor de la de mandada.

"En abril 3 de 1920 el señor Mauricio Falley solicitó personal-
mente y como representante de The Maxim Chemical Co. una am-
pliación del tiempo concedido en el contrato antes expresado, para la
colocación de fondos en el Royal Bank of Canada, fundándose en
que ellos habían hecho una venta de dicha azúcar *bona fide* a una
firma de New Orleans y que el cable autorizando el crédito había
sido enviado dos días antes de expirar el término de la opción, pero
no había sido recibido hasta aquel mismo día 3 de abril.

"En tales condiciones y dada la particular posición en el ne-
gocio del agente de la Maxim Chemical Co. señor Mauricio Falley,
la demandada le concedió hasta el día 7 del mismo mes de abril
(exclusivamente y no con otro objeto) para comunicarse con sus
compradores en New Orleans, explicándoles la situación y pidiendo
un aumento de crédito para cubrir un precio de $15 por quintal
del azúcar vendido, puesto que el mercado aumentaba rápidamente.

"En el indicado día 7 de abril el señor Louis Falley visitó a la
demandada diciendo ser representante de su hermano Mauricio Fal-
ley, alegando haberse cruzado cables con los compradores de New
Orleans y manifestando sus temores de que la contestación con el
crédito solicitado no llegaría a tiempo.

"Como un favor especial la demandada le concedió al señor
Louis Falley, como representante de su hermano Mauricio Falley
y a éste a su vez en representación de The maxim Chemical Co.
hasta las nueve de la mañana del día 9 de abril de 1920; con el
exclusivo objeto de esperar los fondos que ya había enviado la
firma de New Orleans que había comprado el azúcar.

"No habiendo llegado a las nueve de la mañana del día 9 de
abril de 1920 el precio del azúcar tal como había sido convenido, la
demandada dió por rota y nula la negociación."

De los autos hacemos las siguientes citas:

"Demandado: Presento como prueba una carta de la Maxim
Chemical Co., fechada en febrero 16 de 1920, a la Sucesión J.
Serrallés, en la que le anuncia la llegada a Puerto Rico de Mr.
Mauricio Fowler como su representante.

"Demandante: El demandante se opone a la admisión de esta
carta como prueba de la demandada, de fecha febrero 16 de 1920,
primero, porque la firma de la Maxim Chemical Co. en este caso
no ha sido identificada por ningún testigo. Segundo, porque la
**firma ilegible** del *general manager* que aparenta autorización para

firmar, a nombre de esa corporación, no se ha justificado que haya sido previamente autorizado ni que él ocupe el cargo que dice desempeña en esta carta. Tercero, porque según se desprende de toda la prueba de la demandada, el propósito de esta evidencia es justificar un pretendido mandato o agencia a Mauricio Fowler a favor de esta corporación y los mandatos no se prueban en Puerto Rico por manifestaciones o escritos del pretenso mandante sino del mandatario. Cuarto, por ser *res inter alios acta,* es decir, transacción entre la Chemical y Mauricio Fowler, que no es el individuo que según los *pleadings* en este caso, hiciera la negociación en controversia. Quinto, porque resulta de la misma contestación jurada de la demandada, que la primera transacción a que se refiere esta carta endosando al señor Mauricio Fowler era asunto terminado y como tal no tiene relación ni materialidad, ni conexión alguna con la siguiente negociación a quince pesos el quintal y terminable en abril nueve a las nueve de la mañana del 1920. Sexto, por tratarse en esta carta de manifestaciones de *hearsay|* de la Maxim, que nunca serían admisibles en evidencia, a menos que se hubiese tomado una deposición a los oficiales autorizados de esta compañía en New York para que en todo caso declararan lo que es pertinente probar o lo que, se pretende probar con, su *hearsay* y privándonos del derecho constitucional de repreguntar. Y por último, por resultar de la misma carta que tal supuesto mandato en realidad no existió, por cuanto la misma carta sencillamente se refiere a obtener ofertas para ellos y que indudablemente se refiere según declaró Mr. Giles, a ofertas de Serrallés para comprar productos químicos de la Maxim Chemical Co., que es lo que vende esta compañía y cuyo mandato, en todo caso, ostentaría el señor Mauricio Fowler en este momento.

"Juez: La corte la admite.

"Demandante: Tomo excepción.

"Demandado: Presento como prueba una copia de la carta que con fecha abril primero de 1920, dirigida por Sucesión de J. Serrallés, por medio de su *manager* J. M. Giles al señor Mauricio Fowler, acusándole recibo de su telegrama en el que Fowler confirmó la compra de los cinco mil sacos de azúcar; la presento como primera evidencia del contrato celebrado entre la central Serrallés y la Chemical, sobre esa azúcar.

"Demandante: El demandante se opone a la admisión de esta carta de abril uno del 1920 dirigida por la demandada misma a

Mauricio Fowler, a San Juan, Puerto Rico, primero, por tratarse de *self-serving evidence* o sea prueba de la misma demandada relacionada con el mismo asunto. Segundo, porque no se ha justificado que sea en contestación a ningún telegrama según dice esta carta y porque en todo caso ese telegrama ha debido presentarse o demostrarse que el mismo se había extraviado y que en todo caso tendría los términos del verdadero contrato a que la carta se refiere en vez de pretender contenerlos esta carta escrita por la misma demandada. Tercero, por tratarse aquí de la primera negociación a trece dólares, cincuenta centavos quintal de azúcar, de cinco mil sacos, cuyo negocio terminó y no tuvo nada que ver con la posterior de cinco mil sacos de azúcar de Luis Fowler al demandante.

"Juez: La corte la admite.

"Demandante: Tomo excepción.

"Demandado: Presento como prueba copia de una carta escrita por Sucesión J. Serrallés a Mauricio Fowler en abril nueve del 1920 y entregada en ese mismo día personalmente a su hermano Luis Fowler para que le sirviera a Luis Fowler de excusa con la Chemical Co. de por qué no había hecho la transacción.

"Demandante: El demandante se opone a la admisión de esta carta de abril nueve de 1920, primero, por llevar fecha posterior a la terminación de todas las negociaciones de que se trata en este pleito. Segundo, por ser *self-serving evidence* de la demandada misma, dirigida a un individuo que no se menciona en las alegaciones. Tercero, por no estar firmada. Cuarto, por ser una copia y no haberse demostrado el extravío del original, ni ser tampoco una copia en maquinilla, impresa en un libro comercial, ni haberse previamente demostrado que se ha cursado por correo el original de la misma.

"Juez: La corte la admite.

"Demandante: Tomo excepción.

"Los documentos admitidos son los siguientes, copiados a la letra:

"'Febrero 16, 1920.—Sucesión de J. Serrallés, Ponce P. R.— Señores: Confirmamos nuestros cables del 4, 8, 6 y 10 del corriente y acusamos recibo de sus telegramas del 9 y 12 del corriente según copias adjuntas. Es muy de lamentarse que nuestro cable del 4 se dilatara en tránsito considerablemente, pues ello nos hizo creer que Uds. tenían esa cantidad de azúcar disponible para pronto embarque y que Uds. estaban dispuestos a aceptar un precio como el

fijado por nosotros. Además, su cable del 9, que no pudo ser descifrado en su mayor parte complicó el asunto aún más. Como les informábamos en nuestro cable subsiguiente, habíamos hecho arreglos para establecer un crédito en New York con el fin de evitar toda posible demora en el embarque para así poder aprovecharnos de una orden que teníamos a mano y que especificaba embarque a más tardar el 10 del corriente. Sus últimos informes nos dicen que Uds. han enviado 2,000 sacos el día 24, consignados a su agente en New York. ¿Podrían Uds., al recibo de esta carta, tener la bondad de cablegrafiarnos su cotización sobre esta partida, ya que es probable que nosotros pudiéramos hacer uso de ella? Sírvase especificar también su color, polarización y granulación. Para su gobierno les diremos que desde entonces el mercado ha estado bien suplido de azúcares crudos y que las refinerías americanas están haciendo entregas en grandes cantidades. Las clases locales son naturalmente preferidas y los importadores por tanto tendrán que rebajar sus precios para hacer atractiva la compra del producto extranjero. Aprovechamos esta oportunidad para informarles que nosotros mismos fuímos los compradores de la partida anterior que Uds. embarcaron a New York por cuenta de Mr. A. Grand, con quien ya no tenemos más negocios. Si ustedes tienen algunas partidas adicionales, apreciaríamos sus nuevas ofertas, a precio firme de ser posible, para ser contestadas por nosotros dentro de 24 horas después del recibo oficial de sus cables. Nuestro señor Maurice Falley acaba de llegar a Puerto Rico para estar en mejores condiciones de solicitar ofertas ventajosas para nosotros y cualquier ayuda que Uds. le presten será altamente apreciada. Esperando sus nuevas noticias, quedamos muy atentamente, Maxim Chemical Co., Inc. Por (firma ilegible), Gerente General.

" 'Abril 1, 1920.—Señor Maurice Falley.—San Juan, Puerto Rico.—Estimado señor: Hemos recibido su telegrama que dice como sigue: ''Confirmo compra 5,000 sacos azúcar lavado 98.5 o superior, sacos 125 libras, embarque primera mitad abril, precio $13.50 quintal, libre a bordo Ponce. Crédito abierto a su favor Royal Bank of Canada $85,000. Pago contra documentos embarque Ponce. Sírvase confirmar venta por telégrafo.'' Tan pronto como el banco nos haya notificado que el crédito está sujeto a nuestro giro procederemos a embarcar el azúcar que tenemos ya en nuestro almacén en la factoría. Sírvase tomar nota que deberemos recibir instrucciones de embarque con suficiente antelación para poder obtener cabida para la mercancía. En estos días en que todo el mundo trata

de embarcar azúcar a un mismo tiempo se hace a veces difícil obtener cabida para determinada fecha. Haremos todo lo que podamos por efectuar el embarque dentro del tiempo especificado. El precio arriba cotizado es valedero por hoy solamente. Si el crédito no es abierto sujeto a nuestros giros durante el día de hoy, el precio del azúcar necesariamente subirá con el mercado. Muy atentamente, Sucesión J. Serrallés, (fdo.) J. M. Giles.'

" 'Abril 9, 1920.—Sr. Maurice Fally, San Juan, P. R.—Estimado señor: Refiriéndome a nuestra carta de primero de abril sentimos informarle que puesto que su crédito no llegó de Nueva Orleans para cubrir la compra hecha por su comprador allí según se requería por el último párrafo de dicha carta, y como un crédito adicional para cubrir el aumento del precio hasta 15c. tampoco llegó dentro del tiempo especificado, nueve de esta mañana, nos vemos obligados a considerar deshecho el trato.—Muy atentamente.' "

Un escrito archivado por el juez sentenciador dice como sigue:

"La corte como resultado de toda la evidencia en conjunto, es de opinión que la ley y los hechos en este caso están a favor de la demandada Suc. de J. Serrallés y en contra del demandante Adolfo Nones, y que debe registrarse una sentencia, desestimando la demanda, con las costas al demandante."

El demandante apela de una sentencia de desestimación e insiste en lo siguiente:

"1. Erró la corte inferior al no hacer y archivar una relación breve del caso exponiendo los hechos y aduciendo las razones en que fundó su decisión;

"2 Erró dicha Corte de Distrito de Ponce al admitir como prueba de la demandada, contra la objeción y excepción del demandante-apelante, una carta y las dos copias de cartas transcritas en las páginas 94 a 97 de la transcripción taquigráfica de la evidencia, y a las que se refieren las objeciones y excepciones del apelante en las páginas 91 a 94 de dicha transcripción de la prueba; y

"3. Cometió error dicha corte inferior al no estimar probados los hechos de la demanda, considerando y apreciando la prueba practicada con prejuicio al caso del actor-apelante, legalmente ha-

blando, desde luego, y al desestimar, en consecuencia de tal error, la demanda del apelante, con las costas.''

La discusión bajo el primer señalamiento intenta hacer una distinción del caso de *Paganacci* v. *Lebrón,* 24 D. P. R. 796 y se insiste en que en todo caso ciertas expresiones contenidas en la opinión eran *obiter dicta.* Pero en el caso presente no aparece que se levantara en la corte inferior cuestión alguna sobre la omisión de que ahora se queja la parte, mediante moción o de otro modo, y el apelante no discute en forma alguna la cuestión preliminar de la renuncia (*waiver*). En estas circunstancias no creemos necesario ni deseable en este momento discutir las anteriores decisiones de esta corte ni entrar en una investigación independiente acerca de si tales objeciones pueden o no hacerse por primera vez ante esta corte en apelación.

En este caso no estaba envuelta cuestión alguna sobre la responsabilidad de la Maxim Chemical Co. El único punto importante o pertinente acerca de la carta mencionada en el segundo señalamiento fué que la demandada había recibido tal comunicación aparentemente escrita por el gerente general de la firma introduciendo su representante el señor Maurice Fally, o Fowler, que es como se hizo referencia a él quizás más adecuadamente por los abogados en el examen de los testigos. Si la firma de la Maxim Chemical Co. era o no genuina, si el individuo no identificado que firmó como gerente general estaba o no autorizado para firmar a nombre de la corporación y si Fowler era o no de hecho el agente y representante debidamente autorizado de dicha corporación, fueron cuestiones absolutamente inmateriales respecto a cualquier punto en disputa en el caso, si no *res inter alios* (para citar una frase contenida en el cuarto motivo de objeción) en cuanto fueran relevantes en cualquier sentido determinado.

Una investigación prolongada en el sentido sugerido por

el apelante hubiera equivalido a una infructuosa pérdida de tiempo en juzgar cuestiones no levantadas por las alegaciones, y de hacerse ello seriamente por la corte, hubiera podido dar por resultado solamente el distraer la atención del juez sentenciador de la cuestión fundamental envuelta.

La proposición esencial a probar era que la demandada negociaba con Fowler como agente de la Maxim Chemical Company. La carta aparentemente expedida por dicha corporación introduciendo a Fowler como su representante, recibida y aceptada como auténtica por la demandada, quien actuó de acuerdo con ella, era un hecho probatorio admisible como tendente a establecer la proposición últimamente mencionada, ya fuera genuina y auténtica o falsa y no autorizada por la corporación.

La admisibilidad de las copias fechadas abril primero y abril 9, respectivamente, no es tan clara. No parece habérsele ocurrido al abogado establecer el hecho, si es que era un hecho, de que los Fowler estaban ausentes de la jurisdicción, aparte de ninguna demostración de diligencia o aviso suficiente para excusar la omisión de presentar los originales. Ni encontramos tampoco en el alegato de la apelada discusión alguna de la cuestión levantada bajo el segundo señalamiento.

"Mediante un auto judicial no puede obtenerse un documento que se encuentra fuera de la jurisdicción; pero existen cuatro formas posibles de gestión, cualesquiera de las cuales puede ser considerada bastante por una corte antes de excusar la falta de presentación. Si el lugar preciso en que el documento se encuentra es desconocido, puede hacerse un registro; si el poseedor es identificado se le puede requerir para que comparezca con el documento, o se le puede requerir para que entregue un documento para ser usado en el juicio, o puede tomársele una declaración y acompañarse a ella una copia suministrada por él. Ninguna ni varias de estas gestiones podría ser requerida como regla fija, ni tampoco parecen las cortes exigir cualquiera de esos requisitos como regla fija.

"Las providencias se califican en tres grupos generales. En el primer grupo las cortes exigen que se haga una gestión de alguna clase, dependiendo su naturaleza, más o menos, de las circunstancias del caso. En el segundo grupo las cortes, ya por decisión expresa o por omitir el mencionar requisito alguno, excusan la falta de presentación aunque no se haya hecho gestión alguna, siendo suficiente el mero hecho de que el documento esté fuera de la jurisdicción. En el tercer grupo la gestión ya hecha se declara suficiente sin expresar ninguna regla sobre su necesidad." 2 Wigmore, 787, sec. 1213.

Por otra parte parece haber sido un hecho tácitamente aceptado que los Fowler no podían ser traídos como testigos al juicio, aunque no se ha llamado nuestra atención a prueba directa alguna para demostrarlo; y el artículo 24 de nuestra Ley de Evidencia dice en parte lo que sigue:

"No puede haber evidencia del contenido de un escrito, fuera del propio escrito, excepto en los casos siguientes:

"1. Cuando el original se hubiere extraviado o destruído, o estuviere fuera de la jurisdicción del tribunal; en cuyos casos habrá antes que probar tales hechos.

"2. Cuando el original obrare en poder de la parte contra quien se ofreciere la evidencia, y dejare ésta de presentarlo después de haber sido notificada convenientemente."

Ambas cartas estaban dirigidas al señor Maurice Fowler, quien, viendo el caso desde el punto más favorable para la teoría del demandante, estaba investido originalmente con cualesquiera posibles derechos o acciones que pudieran haber pasado por conducto de Louis Fowler al demandante, y si dichas cartas no estaban presuntivamente en poder del demandante o bajo su dominio en lugar que él conociera, de todos modos él las podía conseguir, si es que no eran indispensable para establecer en forma adecuada su reclamación. En tanto en cuanto este punto de vista pueda sostenerse, la contestación de la demandada fué quizá un aviso suficiente para la presentación del original.

De paso añadiremos que todo el caso del demandante en

cuanto se refiere a la hipotética preexistencia de opción a favor de Louis Fowler, al tiempo de los incidentes que ahora consideramos, descansaba enteramente en testimonio de referencia con respecto a manifestaciones verbales hechas por dicho Louis Fowler.

Si se hubiera levantado cualquier objeción a este testimonio el demandante aparentemente no hubiera podido hacer siquiera la dudosa y poco satisfactoria demostración *prima facie* que de hecho se le permitió para evitar, según explica la apelada en su alegato, cualquier apariencia de un deseo de impedir una completa revelación de todos los hechos.

Además, mucho antes de ofrecerse estas cartas el testigo Giles, sin objeción por parte del demandante, había leído el telegrama transcrito en la carta de primero de abril así como extractos de la carta misma, incluyendo el párrafo final en su totalidad; había en substancia expresado todo el contenido, y había dicho que ello fué escrito en contestación al telegrama, al recibirse informes del banco de que el dinero, o el cable autorizando que se abriera un crédito, no había llegado en realidad.

Mencionamos estas cuestiones solamente como indicaciones de las circunstancias en las cuales el juez sentenciador desestimó la objeción a la admisión de las copias de que se trata, tal como fué levantada. De hecho no había cuestión alguna respecto a "pérdida" de los originales, y por consiguiente ninguna base para objeción por este fundamento. Además, aun en la objeción a la admisión de la copia fechada abril 9, tal como fué levantada, no existe especificación alguna de la omisión de demostrar alguna gestión para determinar el paradero de cualquiera de los Fowler, o para conseguir de ellos el original. Si la objeción hubiera sido un poco más amplia y hubiera hecho referencia a la omisión de explicar en alguna forma la falta del original, quizá tal especificación hubiera sido innecesaria.

Pero cuando la demandada se quejó únicamente de la ausencia de cualquier demostración de pérdida, la corte inferior no estaba obligada a levantar de propio acuerdo ulterior cuestión sobre el paradero de los hermanos ausentes o sobre falta de diligencia en la demandada para determinar dicho paradero y obtener de ellos los originales en su poder. Además, en el caso de la copia que fué primeramente ofrecida, que es la única que tiene importancia especial en el caso no hubo objeción alguna sobre cualquiera de los fundamentos últimamente mencionados. Y es razonable suponer que, si se hubiera levantado una objeción adecuada, la demandada entonces hubiera hecho alguna demostración de diligencia o de lo contrario hubiera llamado la atención hacia algún hecho ya conocido de la corte tendente a excusar la no presentación de los originales; y en ese caso el juez sentenciador hubiera tenido una amplia discreción al aplicar la regla a las circunstancias · de este caso particular, y sólo habiendo un claro abuso de ese poder estaríamos nosotros justificados en revocar la sentencia.

Parece haber por parte de la profesión una tendencia general a considerar las palabras *"self-serving declaration"* bien como una frase que se presta a juegos malabares o bien como la expresión aforística de algunos principios bien establecidos de evidencia que son demasiado elementales para requerir una seria discusión. El reciente caso de *Rullán* v. *Vázquez* es un ejemplo de esto.

Es perfectamente claro que una declaración en beneficio propio (*self-serving declaration*) no es admisible por caer dentro de la excepción a la regla sobre testimonio de referencia respecto a una manifestación o admisión en contra propia (*admission against interest*). Pero de ello no se desprende que una carta que forma parte de la correspondencia contentiva de los términos de un contrato deba ser excluída meramente porque fué escrita por una de las partes contratantes, parte también en un pleito subsiguiente

surgido de dicho contrato, y porque tiende a sostener su teoría sobre el caso.

"No existe principio alguno de evidencia que especialmente excluya manifestaciones en beneficio propio (*self-serving statements*) por un acusado o por cualquiera otra persona. La regla sobre testimonio de referencia excluye toda aseveración extrajudicial; y por consiguiente sólo es necesario determinar si tales aseveraciones están comprendidas dentro de alguna excepción a esa regla, o si, tratándose de manifestaciones que caen dentro de ella, éstas son probatorias en alguna forma indirecta aparte de su valor afirmativo." 3 Wigmore, 768; sec. 1765.

El artículo 84 de la Ley de Evidencia dice como sigue:

"Cuando se saca la impresión de una carta en un copiador de cartas, antes de cursar por correo el original, dicha copia de prensa deberá considerarse como original, al igual de la carta así copiada, pudiendo leerse en evidencia al probarse que ésta fué debidamente cursada por correo."

Pero no hay indicación de intención alguna por parte del legislador de excluir, en casos apropiados, las copias de carbón de cartas no copiadas en el copiador ni enviadas por correo sino entregadas por el autor al destinatario o a su agente.

Es cierto que la carta de abril 9 fué escrita al día siguiente de la alegada cesión por Louis Fowler al demandante. Pero hubo también testimonio demostrativo de que Luis Fowler como a las 9 de la mañana del día 9 insistió en que el cable demorado llegaría dentro de unos minutos y suplicó que se le diera una prórroga de 15 o 30 minutos, que le fué negada. Que el cable fué de hecho recibido poco después de las 10, y que Fowler entonces pidió a la demandada la carta en cuestión con el fin de explicar al principal suyo o de su hermano, the Maxim Chemical Co., y su cliente en Nueva Orleans, por qué el azúcar no fué entregado.

La mera indicación de haber transcurrido 24 horas entre

la negativa a entregar el azúcar al demandante y el momento en que se escribió la carta, no es suficiente, a la luz de estas circunstancias, para fundamentar la proposición de que la corte erró al admitir la copia últimamente mencionada, y el error, si alguno hubo, parecería no ser perjudicial.

Con respecto al tercer señalamiento bastará decir que un examen cuidadoso de los autos no revela prejuicio ni manifiesto error en la apreciación de la prueba por parte de la corte inferior.

La sentencia apelada debe ser confirmada.

*Confirmada la sentencia apelada.*

Jueces concurrentes: Sres. Presidente del Toro y Asociados Wolf, Aldrey y Franco Soto.